IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

RYAN MATTHEW BRAISKE and
JOHN WILLIAMS POWELL MAYO,

    Defendants.

No. CR09-0073

REPORT AND RECOMMENDATION

————————————

## TABLE OF CONTENTS

I.    *INTRODUCTION*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   *PROCEDURAL HISTORY*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  *ISSUE PRESENTED*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.  *RELEVANT FACTS*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

V.    *DISCUSSION*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
      A.    *Did Law Enforcement Exceed the Scope of Braiske's*
          *Consent to Search by Pulling Back Panels in Various*
          *Parts of the Minivan?*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
      B.    *Was Braiske Denied the Opportunity to Withdraw*
          *His Consent to the Search of His Minivan?*. . . . . . . . . . . . . . . 10
      C.    *Does the Automobile Exception Apply?*. . . . . . . . . . . . . . . . . . 11

VI.  *CONCLUSION*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

VII. *RECOMMENDATION*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

# I. INTRODUCTION

On the 7th day of December 2009, this matter came on for hearing on the Motion to Suppress (docket number 26) filed by Defendant Ryan Matthew Braiske on November 23, 2009, and the Motion to Suppress (docket number 30) filed by Defendant John Williams Powell Mayo on November 24, 2009. The Government was represented by Special Assistant United States Attorney Daniel A. Chatham. Defendant Ryan Matthew Braiske appeared personally and was represented by his attorney, Jane Kelly. Defendant John Williams Powell Mayo appeared personally and was represented by his attorney, Clemens Erdahl.

# II. PROCEDURAL HISTORY

On October 21, 2009, Defendants were charged by Indictment (docket number 3) with possession with intent to distribute and aiding and abetting the possession with intent to distribute MDMA.[1] At his initial appearance and arraignment on October 26, 2009, Defendant Ryan Matthew Braiske ("Braiske") entered a plea of not guilty. At his initial appearance and arraignment on October 28, 2009, Defendant John Williams Powell Mayo ("Mayo") entered a plea of not guilty. Trial for both Defendants was scheduled before Chief Judge Linda R. Reade on December 21, 2009.

On November 23, 2009, Braiske timely filed his motion to suppress, and on November 24, 2009, Mayo timely filed his motion to suppress. On November 24, 2009, Braiske filed a notice of intent to plead guilty. *See* docket number 28. On November 30, 2009, Mayo filed a notice of intent to plead guilty. *See* docket number 34. On December 7, 2009, both Defendants entered conditional pleas of guilty to Count 1 of the Indictment, pursuant to FEDERAL RULE OF CRIMINAL PROCEDURE 11(a)(2). Defendants' guilty pleas were accepted by Chief Judge Linda R. Reade on December 22, 2009. *See* docket numbers 57 and 58. If the Court grants the motions to suppress, then Defendants may withdraw their guilty pleas.

---

[1] MDMA is methylenedioxymethamphetamine, commonly called "ecstacy."

### III. ISSUE PRESENTED

Defendants claim that evidence seized during a search of Braiske's minivan on September 24, 2009, must be suppressed because (1) the search exceeded the scope of Braiske's consent to search, and (2) the state troopers conducting the search denied Braiske the opportunity to revoke his consent to search.

### IV. RELEVANT FACTS

On September 24, 2009, at approximately 2:21 p.m., Iowa State Patrol Trooper Nathan Andrews stopped a green 1996 Chrysler Town and Country minivan because the driver was not wearing a seatbelt. Andrews made contact with the driver of the minivan and asked him for his driver's license, registration, and insurance information. The driver's hand visibly shook as he handed Andrews an Illinois identification card, registration, and insurance information. Andrews identified the driver as Defendant Braiske.

Trooper Andrews also observed a passenger in the minivan, who was identified as Defendant Mayo. Andrews noted that Mayo was extremely nervous, was breathing heavily, and avoided eye contact. Andrews further observed that the minivan had a "lived-in" look with food wrappers, drink containers, and trash scattered throughout the vehicle. According to Andrews, this signifies "hard travel," which is "common for drug carriers."

Trooper Andrews had Braiske accompany him to his patrol car to complete the citation for the seatbelt violation.[2] Andrews observed that Braiske's hand continued to shake. He asked Braiske whether it was common for his hand to constantly shake. Braiske replied that his hand shaking was not normal.

Braiske told Trooper Andrews that he purchased the vehicle in April. However, the vehicle registration produced by Braiske was blank. A packet of information provided

---

[2] A camera in Trooper Andrews' car recorded the stop. A microphone in the patrol car recorded the conversation between Trooper Andrews and Braiske. A DVD recording was introduced at the hearing as Government's Exhibit 1.

by Braiske to Andrews included a citation for driving without a seatbelt. According to Braiske, he had just paid a $110 ticket for a seat belt violation, and he admitted having three prior seat belt violations. Braiske stated that they had been driving since Colorado and he got "tired" of wearing his seat belt and would put his feet up "Indian style" with the cruise control on.

Trooper Andrews then asked Braiske about his trip. Braiske told Andrews that he went to Colorado for a couple of weeks to visit Mayo. While in Colorado, he stayed with Mayo at his house. Braiske stated that he and Mayo were driving to Illinois and Mayo was planning to go on to Virginia by himself.

Next, Trooper Andrews asked Braiske whether he had ever been arrested. Braiske informed Andrews that he had been arrested approximately five times for drug-related offenses and had spent two years in prison for possession and sale of cocaine, getting out in 2008. Andrews radioed a request for Braiske's criminal history.

While waiting for Braiske's criminal history, Trooper Andrews inquired if Braiske had a driver's license. Braiske stated that he had received a traffic ticket in Illinois and the State had taken his license pending the payment of his fine. According to Braiske, he had paid the ticket, and had received his license in the mail while he was gone. Andrews also asked Braiske where he and Mayo were going in Illinois. Braiske replied that they were going to his house and from there, Mayo might take a bus to Virginia or return to Colorado. During their conversation, Andrews observed that Braiske's breathing was labored, the pulse in his neck was visible, and he developed red blotches on his face. Andrews became suspicious of Braiske's answers, and told Braiske that he was "trying to make sense of your trip."

Approximately 18 minutes into the stop, Trooper Andrews had Braiske remain in the patrol car, while he exited the vehicle in order to speak with Mayo, who remained sitting in the passenger seat of the minivan. Andrews asked Mayo for identification. Mayo provided a Colorado driver's license. Mayo told Andrews that he drove to Illinois

from Virginia to meet Braiske, left his car at Braiske's girlfriend's house in Chicago, traveled with Braiske to Colorado, spent one week in Colorado, and was returning to Chicago to pick up his car and return to Virginia. During their conversation, Andrews noted that Mayo was extremely nervous, his pulse was visible in his neck, his breathing was labored, beads of sweat formed on his forehead, and he avoided eye contact.

Trooper Andrews returned to his patrol car and reviewed Braiske's criminal history, which he had requested earlier. Braiske's criminal history records confirmed that his driver's license was valid and that he had several prior drug-related offenses. Andrews again asked Braiske about his trip. Braiske reiterated that he met Mayo in Colorado and that Mayo lived in Colorado.

Trooper Andrews finished Braiske's seatbelt citation, reviewed it with him, returned his documents, stated "that's all I've got," and advised Braiske to be careful pulling back onto the interstate. At approximately 2:50 p.m., about thirty minutes after the initial stop, Braiske opened the door to the patrol car to return to his minivan. While exiting the patrol car, Andrews asked Braiske whether he had any guns, knives, explosives, large amounts of money, or drugs in his minivan. Braiske replied "no." Andrews asked Braiske if he could search his minivan. Braiske stated "I'd prefer not." Andrews asked Braiske to clarify his answer and Braiske said "no." Andrews then asked Braiske whether he would be willing to wait for a canine unit to sniff the minivan. Braiske responded "You can search it, but I'm already out the door." Andrews acknowledged that Braiske was out the door, and Braiske said "You can run through it real quick." In order to clarify Braiske's consent, Andrews asked Braiske again whether he could search his minivan. Braiske replied "Go ahead, I don't care." Andrews inquired whether his answer "was a yes." Braiske responded "Yes, go ahead." Andrews requested that Braiske return to the front seat of the patrol car. Braiske stated "I knew you were going to ask, there's really nothing in there, so I really don't care."

Upon re-entering the patrol car, Trooper Andrews informed Braiske that Mayo had told him a different story about their trip. Braiske repeated his previous story and stated that he had driven out to Colorado to meet Mayo. Andrews told Braiske that Mayo told him he had driven from West Virginia to Braiske's house in Illinois, and then rode with Braiske to Colorado. Braiske then told Andrews that prior to the traffic stop, Mayo told Braiske to say he had picked Mayo up in Colorado, because Mayo had a Colorado identification.

Trooper Andrews then returned to the minivan to speak with Mayo. While approaching the minivan, Andrews found an empty plastic one-inch square zip-lock bindle on the ground directly outside the passenger-side door. The bindle had devil-head markings on it and was consistent with drug packaging. Andrews observed that Mayo's body was shaking and tense, and asked Mayo if he was having a heart attack. Mayo replied "no." Andrews showed Mayo the bindle, but Mayo denied seeing it before. Andrews then observed a matching bindle in plain view on the floorboard of the minivan between Mayo's feet. Mayo denied throwing the bindle outside the minivan, handed the other bindle to Andrews, and denied instructing Braiske to say Braiske had picked him up in Colorado. Mayo then consented to a search of his person, bags, and the minivan.

Additional troopers arrived and assisted Trooper Andrews with the search. First, the troopers searched both Braiske's and Mayo's persons and bags and discovered no contraband. During the search of the minivan, Braiske sat in the front seat of Andrews' patrol car, with Mayo standing outside next to the passenger door. One trooper stood with Mayo next to Andrews' patrol car. The passenger window of the patrol car was rolled up, but the vehicle was on and the window could have been lowered by Braiske. The door of the patrol car was unlocked.

Upon searching the minivan, the troopers found a screwdriver and a magazine about growing marijuana in a rear storage compartment. Andrews used the screwdriver to pull back paneling on the rear hatch of the minivan. Andrews observed signs of tampering.

6

Specifically, Andrews noticed that a plastic covering in the void behind the panel had been disturbed, suggesting that the panels had been accessed at some time. Next, the troopers pulled back the paneling on the passenger-side sliding door and saw duct tape in the interior portion of the door. The troopers believed that there was a package behind the paneling. The troopers removed the panel from the door and discovered two duct-taped packages containing white powder. The troopers removed the paneling on the driver-side sliding door and discovered four additional packages containing white powder. Lab testing revealed that the white powder was MDMA, commonly called "ecstasy."

## V. DISCUSSION

Defendants argue that Iowa State Troopers exceeded the scope of Braiske's consent to search his minivan when they began pulling back panels in various parts of the vehicle without probable cause. Defendants also argue that by keeping Braiske in the patrol car during the entire search of the minivan, the troopers denied Braiske the opportunity to withdraw consent to an extended search of the vehicle, including removal of interior panels.

### A. Did Law Enforcement Exceed the Scope of Braiske's Consent to Search by Pulling Back Panels in Various Parts of the Minivan?

"A warrantless search of a vehicle does not violate the Fourth Amendment if the law enforcement officer first obtains voluntary consent to search." *United States v. Siwek*, 453 F.3d 1079, 1084 (8th Cir. 2006) (citing *United States v. White*, 42 F.3d 457, 459 (8th Cir. 1994)). Defendants concede that Braiske's consent to search the minivan was voluntary.

The boundaries of a consensual automobile search are confined, however, to the scope of the consent. *Siwek*, 453 F.3d at 1084 (citations omitted); *see also United States v. Alverez*, 235 F.3d 1086, 1088 (8th Cir. 2000) ("A search resulting from an individual's general statement of consent is limited by boundaries of reasonableness."). The scope of consent to search is measured by a standard of objective reasonableness. *Siwek*, 453 F.3d

at 1085 (citing *United States v. Urbina*, 431 F.3d 305, 310 (8th Cir. 2005)). Specifically, the standard is "what 'the typical reasonable person would have understood by the exchange between the officer and the suspect.'" *Siwek*, 453 F.3d at 1085 (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *see also United States v. Ferrer-Montoya*, 483 F.3d 565, 568 (8th Cir. 2007) (same). In *Ferrer-Montoya*, the Eighth Circuit Court of Appeals explained that:

> 'The Scope of a search is generally defined by its expressed object,' and therefore an officer may reasonably interpret a suspect's unqualified consent to search a vehicle for drugs to include consent to, inter alia: 'search containers within that car which might bear drugs,' probe underneath the vehicle, and open compartments that appear to be false, or puncture such compartments in a minimally intrusive manner.

483 F.3d at 568 (quotations and citations omitted); *see also United States v. Gallardo*, 495 F.3d 982, 990 (8th Cir. 2007) ("We have held that 'the typical reasonable person' would understand a suspect's general consent to search a vehicle for drugs to include consent to open unlocked containers within a vehicle, access apparently false compartments, and 'search any part of the truck where drugs might be stored.'") (quotations and citations omitted).

In *Siwek*, the defendant consented to a search of his truck for weapons, stolen property, cocaine, or marijuana. 453 F.3d at 1082. When the officer searching the truck attempted to search the truck bed, he discovered that the tonneau cover was locked. *Id*. The defendant claimed that he did not have the key to the tonneau cover and a search of his person confirmed his claim. *Id*. The officer then slid underneath the truck bed and probed a drain hole located behind the driver's seat with a wire probe. *Id*. at 1082-83. Specifically, the officer:

> inserted a wire probe through the drain hole in the frame and through the corresponding drain hole in the bed that was aligned with and located approximately four inches above the hole in the frame. The probe touched something that to [the officer] seemed heavy. Using a flashlight to see inside the

> drain hole, [the officer] viewed what appeared to be green plastic wrap. . . . [The officer] inserted the probe again to move the object. However, the wire probe punctured the plastic wrap and entered the package. When [the officer] removed the probe, a green substance was stuck on the end of the probe.

*Id.* at 1083. The green substance was identified as marijuana. *Id.* The Eighth Circuit determined that:

> When Siwek voluntarily gave a general statement of consent to search his truck, he authorized a search for the items about which [the officer] had questioned him--weapons, stolen property and illegal drugs. It was objectively reasonable for [the officer] to search any part of the truck where these items might be stored.

*Id.* at 1085 (citation omitted). The Eighth Circuit concluded that the officer "was acting within the scope of the consensual search when he inserted a wire probe into the open drain hole and punctured the plastic wrap with the probe." *Id.*

Here, Trooper Andrews received consent from Braiske to search his minivan for guns, knives, explosives, large amounts of money, or drugs. While searching the minivan, Trooper Andrews discovered a flat-head screwdriver in a rear compartment. In his experience as a drug interdiction trooper, discovery of such a tool alerted Trooper Andrews to the possibility that he was dealing with drug couriers and that contraband may be hidden in an area where tools were needed to access it. Trooper Andrews also knew that Braiske had been to prison for selling drugs, and that Braiske and Mayo had given inconsistent stories regarding their trip to Colorado.

Trooper Andrews used the screwdriver to pry back the paneling on the rear hatch and observed signs of tampering. Trooper Andrews noticed that the plastic covering had been disturbed, suggesting that the panels had been accessed at some time. Next, the troopers pulled back the paneling on the passenger-side sliding door and saw duct-tape in the interior portion of the door and believed that there was a package behind the paneling. The troopers removed the panel from the door and discovered two duct-taped packages

containing white powder. The troopers removed the paneling on the driver-side sliding door and discovered four additional packages containing white powder.

The Court determines that by voluntarily giving his consent to search the minivan, Braiske authorized Trooper Andrews to search for the items Trooper Andrews had questioned him about--guns, knives, explosives, large amounts of money, and drugs. *See Siwek*, 453 F.3d at 1085. The Court finds that it was objectively reasonable for Trooper Andrews "to search any part of the truck where these items might be stored." *Id*. The Court concludes that Trooper Andrews was acting within the scope of the consensual search when he pulled back the paneling in the minivan. *Id*.

### B. Was Braiske Denied the Opportunity to Withdraw His Consent to the Search of His Minivan?

Consent to search may be withdrawn if the withdrawal of consent is made by an unequivocal act or statement. *United States v. Sanders*, 424 F.3d 768, 774 (8th Cir. 2005) (citation omitted); *see also United States v. Gray*, 369 F.3d 1024, 1026 ("Withdrawal of consent need not be effectuated through particular 'magic words,' but an intent to withdraw consent must be made by unequivocal act or statement.") (citing *United States v. Ross*, 263 F.3d 844, 846 (8th Cir. 2001)). Here, Defendants do not claim they withdrew their consent to search the vehicle. Defendants argue, however, that Braiske was deprived that opportunity by being told to sit in the patrol car during the search.

In *Gallardo*, a defendant who gave law enforcement officers consent to search his pick-up truck, claimed on appeal that he was deprived of the opportunity to withdraw or limit the scope of his consent to search after the search began, because he was told to sit in a squad car during the search. 495 F.3d at 990. The Eighth Circuit Court of Appeals rejected the argument.

> [T]he facts here do not compel the conclusion that Gallardo [(the defendant)] lacked [] an opportunity [to withdraw or limit the scope of his consent]. The squad car was parked immediately behind Gallardo's truck. Gallardo was not handcuffed, and he sat in the front seat of the squad car for the

duration of the search. If Gallardo wished to withdraw his consent, there is no evidence that he was unable to do so--particularly because Gallardo made no attempt to attract the attention of the officers once the search began. Under these facts, Gallardo was at least obligated to make some effort to communicate an intent to withdraw his consent. He did not, and therefore we find Gallardo's argument on this issue to be without merit.

*Id.*

The facts here are indistinguishable from *Gallardo*. Trooper Andrews' patrol car was parked immediately behind Braiske's minivan. Braiske was not handcuffed, and he sat in the front seat of the patrol car for the duration of the search. Braiske made no effort during the search of his minivan to notify anyone that he wished to revoke his consent, even though a state trooper was standing just outside the passenger door. The door was unlocked and the window was operational. There is no evidence that if Braiske wanted to withdraw his consent, that he was unable to do so. Because Braiske made no effort to communicate an intent to withdraw his consent, the Court finds Defendant's argument on this issue to be without merit.[3] *See Gallardo*, 495 F.3d at 990.

### C. Does the Automobile Exception Apply?

The Government also argues that the automobile exception is applicable in this matter. For the reasons set forth above, the Court believes that it is unnecessary for the

---

[3] The Court notes that in his brief, Braiske argues that "When Ryan Braiske saw a trooper use a tool in an effort to pull back the interior panel of the back door of the van, his reaction, according to the audio recording in the patrol car, was to say 'what the f*** is he doing?' Such a response strongly suggests Ryan Braiske did not intend his consent to extend to dismantling portions of his vehicle." *See* Braiske's Brief in Support of Motion to Suppress (docket number 26-1) at 4. While Braiske may have been alarmed or upset that the troopers searching his minivan were using a tool to pull back paneling, he made no effort to communicate his displeasure or withdraw his consent to search with any state trooper on the scene. *See United States v. Gray*, 369 F.3d 1024, 1026 ("Withdrawal of consent need not be effectuated through particular 'magic words,' but an intent to withdraw consent must be made by unequivocal act or statement.").

district court to address the automobile exception, since Trooper Andrews' search of Braiske's minivan did not exceed the scope of Braiske's consent to search and Braiske was not denied the opportunity to withdraw his consent. Nonetheless, the Court will address the issue in case the district court disagrees with its analysis on consent to search issues.

The automobile exception allows law enforcement officers to "search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity." *United States v. Cortez-Palomino*, 438 F.3d 910, 913 (8th Cir. 2006) (per curiam) (citation omitted). "Probable cause exists 'where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* (quoting *United States v. Kennedy*, 427 F.3d 1136, 1141 (8th Cir. 2005)). If probable cause exists to search a lawfully stopped vehicle, "'it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.'" *United States v. Olivera-Mendez*, 484 F.3d 505, 512 (8th Cir. 2007) (quoting *United States v. Ross*, 456 U.S. 798, 825 (1982)).

During his interactions with Braiske and Mayo, Trooper Andrews observed the following suspicious circumstances: (1) Braiske exhibited signs of nervousness, including shaking hands, labored breathing, visible pulse in his neck, and the development of red blotches on his face;[4] (2) Mayo exhibited signs of extreme nervousness, including labored breathing, sweating, visible pulse in his neck, and avoidance of eye contact;[5] (3) Braiske and Mayo made contradictory statements to Trooper Andrews about their trip;[6] (4) Trooper Andrews learned through a criminal history search that Braiske had a

---

[4] *See United States v. Hill*, 386 F.3d 855, 858 (8th Cir. 2004) (nervous behavior contributed to a finding of probable cause).

[5] *Id.*

[6] *See United States v. Ameling*, 328 F.3d 443, 448-49 (8th Cir. 2003) (contradictory statements by two passengers in a vehicle supported a finding of probable cause).

significant history of drug-related offenses;[7] and (5) Trooper Andrews discovered two bindles consistent with drug packaging--one on the ground outside the passenger door of the minivan and one in plain view on the passenger-side floor of the minivan.[8] Based on the totality of the circumstances, the Court finds that Trooper Andrews had probable cause to search the minivan for contraband under the automobile exception. *See Cortez-Palomino*, 438 F.3d at 913.

## VI. CONCLUSION

In the motions to suppress, Defendants argue that Iowa State Troopers exceeded the scope of Braiske's consent to search his minivan and denied Braiske the opportunity to withdraw his consent to search. For the reasons set forth above, I disagree. Even if the troopers exceeded the scope of Braiske's consent to search or denied him the opportunity to withdraw his consent to search, the troopers had probable cause to search the minivan under the automobile exception. Accordingly, Defendants motions to suppress should be denied.

## VII. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that the district court **DENY** the Motion to Suppress (docket number 26) filed by Defendant Ryan Matthew Braiske on November 23, 2009, and **DENY** the Motion to Suppress (docket number 30) filed by Defendant John Williams Powell Mayo on November 24, 2009.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the District Court. *Defendants are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange*

---

[7] *See United States v. Valle Cruz*, 452 F.3d 698, 703 (8th Cir. 2006) (significant criminal drug history supports a finding of probable cause).

[8] *See United States v. Fladten*, 230 F.3d 1083, 1086 (8th Cir. 2000) (observation of drug paraphernalia in plain view supports a finding of probable cause).

*promptly for a transcription of all portions of the record the district court judge will need to rule on the objections."* Accordingly, if Defendants are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on December 7, 2009.*

DATED this 23rd day of December, 2009.

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA